UNITED  STATES  DISTRICT  COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

CASE NO. 5:21CR00329-001

    -v-

RAFAEL RONDON,

       Defendant.

# **<u>SENTENCING MEMORANDUM</u>**

DATED:  May 24, 2023

           Respectfully submitted,

           LISA A. PEEBLES
           Federal Public Defender

        By: Randi J. Bianco, Esq.
          Supervisory AFPD
          Bar Roll No. 507514
          Clinton Exchange, 3rd Floor
        4 Clinton Square
          Syracuse, New York 13202
          (315) 701-0080

## I.     Preliminary Statement

On December 16, 2022, the Defendant Rafael Rondon, hereinafter "Rafael," pled guilty (without a plea agreement) to a single count indictment charging him with Possession of a Short-Barreled Unregistered Firearm in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871. Rafael is scheduled for sentencing on June 27, 2023.

A Presentence Investigation Report (hereinafter referred to as "PSR") was prepared by the United States Probation Department on May 8, 2023, in anticipation of his sentencing. According to the PSR, Rafael's total offense level is 15 after acceptance of responsibility and his criminal history category is 1, which results in a guideline imprisonment range of 18 to 24 months imprisonment.

The Supreme Court's decision in *United States v. Booker* and *United States v. Fan-Fan*, 125 S.Ct. 738 (2005) excised the provisions in the Sentencing Statute which make the guidelines mandatory and held that they are only advisory and can do no more than require a court to consider guideline ranges. *See* 18 U.S.C.§ 3553 (a)(4). Therefore, in determining a sentence, a court must not only consider guideline calculations, but equally take into account all other statutory concerns listed in 18 U.S.C. § 3553 (a)(2), as well as the unique circumstances of the Defendant.  *See* § 3553 (a) (Supp. 2004).

The Sentencing Reform Act provides, in part, that:

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in Paragraph (2) of this subsection.  The Court, in determining the particular sentence to be imposed shall consider:

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2)     The need for the sentence imposed;

2

(A)     To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     To afford adequate deterrence to criminal conduct;

(C)     To protect the public from further crimes of the defendant; and

(D)     To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. (18 U.S.C. § 3553(a)).

After a careful consideration of the totality of relevant circumstances surrounding this case, we are asking this Court to depart downward and sentence Rafael to a term of probation. At the time of sentencing, Rafael will have been on pre-trial release for 20 months which this Court can consider when imposing sentence.

## II.    The Nature and Circumstances of the Offense

Rafael has fully realized the gravity of his mistake by possessing a short barreled unregistered firearm. When law enforcement arrived at his home, they found the barrel of a shotgun but it was missing pieces from the shotgun. Rafael was fully cooperative with law enforcement and took them to his grandmother's property where there is a hunting camp and showed them where the remaining pieces of the shotgun were located. Rafael wants the Court to know he had no intention of using the shotgun in an unlawful manner. He accepts full responsibility for his actions and knows what he did was wrong.

## III.   Rafael's Personal History and Characteristics

Rafael is 25 years old and was born and raised in Watertown, New York. In 2015, Rafael left Watertown to attend college at the University of Buffalo. After two years in Buffalo, Rafael decided to relocate to New York City. There, he suffered life-threatening injuries after falling from a six-story building.

### a)  Physical Health Problems

On May 16, 2019, when Rafael was nineteen years old, he was smoking a cigarette

3

on top of a six-story building when he tripped and fell from the fire escape landing. [PSR ¶ 38]. It was a miracle that he survived. When EMS reported to the scene Rafael was alive but on the way to the hospital, he had gone into cardiac arrest for two minutes causing EMS to start CPR. [PSR ¶ 38]. Rafael was brought into the trauma center at Bellevue Hospital Center where it was determined that he had sustained numerous injuries including: a splenic laceration, a left acetabular fracture, right open olecranon fracture, and a left distal humerus fracture. [PSR ¶ 38]. He was taken directly to receive a CT scan, where it was determined that he was suffering from: a pneumothorax in both lungs; multiple fractures in both sides of his rib cage; a grade five laceration of the spleen with active arterial extravasation into his abdomen; multiple lacerations in his abdomen and pelvis; a fracture through the left iliac wing; and a mildly displaced fracture of the thoracolumbar spine. [PSR ¶ 38]. In a separate CT scan of his face, it was determined that Rafael was suffering from multiple facial fractures including: a bilateral comminuted nasal bone and septum fracture; bilateral LeFort II fractures; extensive fractures of the mandible; multiple fractures in the maxillary alveolar ridge; multiple fractures of his teeth; and a nondisplaced fracture of the right zygomatic arch. [PSR ¶ 38]. Later, as a result of a delayed finding, Rafael was diagnosed with a left nondisplaced 4th metacarpal base and a 5th metacarpal head fracture, which was treated nonoperatively with four weeks of splinting. [PSR ¶ 38]. After receiving his CT scan, Rafael was immediately taken to into the operating room for injury management, including management of his respiratory arrest. [PSR ¶ 39]. Upon further discovery the surgeons noticed that Rafael's spleen was fractured throughout, which required a splenectomy to be performed. [PSR ¶ 39]. During this procedure Rafael lost 250 cc's of blood after accounting for the 750 cc's of blood that was found pooled in his abdomen and stomach. [PSR ¶ 39]. At the close of this procedure the surgeons decided to leave Rafael open in order to get an additional look at his extensive wounds the following day. That night Rafael had a

chest tube inserted, an exploratory laparotomy, a splenectomy, as well as repair of serosal injuries and large bowel. [PSR ¶ 39].

During the course of his month long hospitalization Rafael had an abdominal washout, a JP placement in splenic recess, a G tube placement, as well as a retrograde urethrogram. [PSR ¶ 40]. He received an ORIF L acetabulum to repair the fractures on the left side of his pelvis. [PSR ¶ 40]. He had a tracheostomy and the removal of the chest tube. [PSR ¶ 40].  He received an olecranon ORIF to repair his right elbow and his right patella. [PSR ¶ 40]. And had his mandible and maxilla repaired, his nose fractures repaired, and his dental extractions performed. [PSR ¶ 40]. He also had his distal humerus and left olecranon repaired. [PSR ¶ 40].

After more than approximately two dozen surgeries, he was brought to a rehabilitation facility in Yonkers, New York where he remained for approximately one month. [PSR ¶ 35]. When he was released, he returned home to his parents' house in Watertown where they helped him recover until May 2022. [PSR ¶ 35]. Rafael still has chronic pain in his knee and hip but he has learned to live with it and refuses all pain medications. [PSR ¶ 41].

Despite this massive setback, Raphael has worked hard to overcome his injuries. According to his longtime friend, Eric Gibbs, Rafael "refused to succumb to the pain, doubt, and anger he felt and day by day he rehabilitated himself both mentally and physically." [Character Letter of Eric Gibbs]. Just two days after the incident, another close friend recalls Rafael attempting to get up and walk. [Character Letter of Patrick Batey]. Through his determination and perseverance, Rafael was able to make a full recovery. In fact, within a year of the injury, Rafael hiked the highest peak in New York State. [Character Letter of Eric Gibbs]. As one of his friends, Jacob Favret, observed: "There were many times where it was obvious that [Rafael] was in immense pain but never once let us know it. He is truly unstoppable when he decides he is going to accomplish something."

5

[Character Letter of Jacob Favre].

Beyond his physical injuries, Rafael also has worked to overcome the severe depression that resulted from his disfigurement. After the accident, Rafael was faced with the reality that he might not be able to enjoy the physical activities he used to, such as running, snowboarding, and playing tennis. He was also left with a changed appearance and constant, grueling pain from the countless injuries and surgeries. All this set Rafael into a deep depression, and his parents worried that he would take his own life. [Character Letter of Mary Oberle]. But Rafael did not give up. Every day, he worked hard to rebuild his mental strength along with his physical strength. As his uncle remarked, this experience has allowed Rafael to grow "spiritually and mentally" and has "further shape[d] his love for his family, sense of [sheer] determination, focus, mental strength, compassion for others and a renewed zest for life." [Character Letter of Anthony Rondon].

Throughout his difficult recovery, Rafael has looked out for others. While recovering in Watertown, Rafael helped care for his maternal grandmother and provide her companionship and comfort. Multiple times a week, Rafael drove 30 minutes to her house, where he would help her cook, clean, and do chores. [Character Letter of Mary Oberle]. Rafael would also take her to the store and to doctor's appointments that were often an hour away. Additionally, Rafael assisted his Uncle Larry, who is visually impaired and has diabetes. He took him to doctor appointments, shopped for him, and helped him cook and clean. [Character Letter of Mary Oberle].

Rafael also made efforts to check in on his friends and support them when they were in need. One of his friends, Mark Lauria, recalls Rafael encouraging him to push through his cancer treatments when all he wanted to do was give up. [Character Letter of Anthony Rondon]. When another friend, Eric Gibbs, was going through troubles of his own, Rafael often made the 90-minute drive to buy Eric lunch, take him out for a drink, and console him when he felt alone. As Gibbs

stated in his support letter: "Both myself and those that know Rafael are immensely grateful and lucky to have a source of such undying support and generosity in our lives." [Character Letter of Eric Gibbs].

Pursuant to U.S.S.G. §5H1.4, a person's physical condition may be relevant in determining whether a departure is warranted, if the condition individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. Clearly, the injuries Rafael suffered as a result of his six-story fall were severe and life-threatening. Nevertheless, Rafael's ability to overcome these injuries and rehabilitate his body and mind show that he is capable of rehabilitating himself once again, outside of prison.

**b)** **Rafael's Good Behavior on Pre-trial Release Supports a Non-Incarcerative Sentence**

Rafael self-surrendered to federal authorities on October 1, 2021, and was released to pretrial supervision. He has done exceptionally well while on pre-trial release these past 20 months. Since the Court approved his relocation to Florida, he "remains compliant with the terms of his release." [PSR ¶ 4]. This fact alone supports a non-incarcerative sentence. Further, Rafael passed all six of his drug toxicology screenings. [PSR ¶ 4].[1]

Courts have considered a defendant's good behavior while under pre-trial supervision in determining the appropriate sentence. *See United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) (in heroin distribution case where guidelines were 47-56 months, district court court's sentence of one year and one day in prison to be followed by one year home detention was reasonable in part because of defendant's behavior while on pre-trial release for 1 ½ years);

---

[1] While the first screening was positive for marijuana, this was attributed to use prior to his arrest. [PSR ¶ 4].

*United States v. Baker*, 502 F.3d 465 (6th Cir. 2007) (below guideline sentence of probation with one year house arrest was proper in part because defendant behaved "exceedingly well" while under supervision). Given Rafael's compliance with the terms of his release, the Court should impose a non-incarceration sentence as prison is not necessary to protect the public from the unlikely event Rafael will commit any future crimes.

### c) Post Offense Rehabilitation

Rafael's post-offense rehabilitation should be greatly considered upon sentencing. *See United States v. Rosado*, 254 F. Supp. 2d 316, 321 (S.D.N.Y. 2003) (While in jail, defendant successfully completed a shock incarceration program and obtained his high school equivalency diploma. He also appears to have given up drugs, found employment, and begun to support his children. He has severed his ties with his drug-dealing friends and Court gave defendant a two-level departure for extraordinary post-offense rehabilitation). Rafael has made remarkable use of his time while this case was pending. After he was released, Rafael decided to pursue a career in welding. In March 2022, Rafael enrolled in the Welding Technology program at Indian River State Location in Fort Pierce, Florida. [PSR ¶ 44]. According to his welding instructor, Rafael displayed a level of preparation and due diligence above his peers. While most students wait until the first day of class to obtain the requisite materials, Rafael reached out to his instructor months in advance to make sure he had the necessary equipment to be a successful student. [Character Letter of Joseph Graham].

As the program progressed, Rafael continued to display this model behavior and overcome any adversity he faced. When presented with complex technical challenges, Rafael would often stay late and come in early to work on the welding problems with his instructor. As his instructor remarked, he was "often impressed with his drive as well as his ability to ask the right questions

with complete humility whenever he was having difficulty." [Character Letter of Joseph Graham]. When other students needed help, his instructor also noticed that Rafael was the one who "motivated and supported his peers with empathy and compassion." [Character Letter of Joseph Graham]. Relying on his own experience overcoming adversity, Rafael volunteered to "help other students study for exams, practice for weld tests, and generally build up morale." [Character Letter of Joseph Graham].

This past May, Rafael graduated from the welding program and looks forward to beginning his career. He also intends to pursue vocational training to increase his welding skills. Rafael has learned from his mistakes and hopes to move forward as a contributing member of society.

### IV.    Conclusion

In *Nelson v. United States*, 555 U.S. 350 (2009), the Supreme Court held that "the court may not presume that the guidelines range is reasonable." Here, based on the factors outlined above in 18 U.S.C. 3553(a), a guideline sentence of 18 to 24 months incarceration would be greater than necessary to comply with the purposes of punishment. While Rafael should be punished for this offense, we ask the Court to consider a sentence of probation based on his excellent compliance with pre-trial release and his post-offense rehabilitation. Such a sentence would afford adequate deterrence to criminal conduct in light of the circumstances present here.

DATED:     May 22, 2023                    Lisa A. Peebles
                                           Federal Public Defender

                              By:    *S/Randi J. Bianco, Esq.*
                                     Supervisory AFPD
                                     Bar Roll No. 507514
                                     4 Clinton Square, 3rd Floor
                                     Syracuse, New York   13202
                                     (315) 701-0080

To:    Richard Southwick, AUSA
        Steven C. Green, AUSA
        Nicholas J. Bavaria, USPO
        Rafael Rondon